**Ronald L. HARTMAN, Plaintiff,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant.**

**No. C–82–0704–WAI.**

United States District Court,
N.D. California.

April 2, 1986.

Ronald L. Hartman, in pro. per.

Asst. U.S. Atty., Judith Whetstine, San Francisco, Cal., for defendant.

## ORDER

INGRAM, District Judge.

Plaintiff seeks review of a denial of benefits by the Secretary of Health and Human Services ("Secretary") under 42 U.S.C. § 405(g). For the reasons set forth below, the court ORDERS that plaintiff's motion for summary judgment is GRANTED.

Plaintiff filed an application for disability insurance benefits on December 15, 1977, alleging disability in the form of schizophrenia since 1972. Upon denial of this claim, plaintiff filed his current application for disability insurance benefits, again based on schizophrenia, on October 22, 1979, alleging disability since October 1, 1965. This claim was denied by the Social Security Administration, which determined that plaintiff was not disabled prior to the expiration of his insurance coverage on December 31, 1966. An administrative law judge ("ALJ") dismissed the application based on *res judicata.* Plaintiff appealed that decision to the Appeals Council, which remanded the case for a hearing. After a *de novo* hearing, the ALJ issued a decision on July 28, 1981, finding plaintiff not disabled prior to December 31, 1966. This became the final decision of the Secretary when it was approved by the Appeals Council on December 28, 1981.

On February 17, 1982, plaintiff filed a complaint in this court for review of the Secretary's decision. On July 28, 1983, after submission of new evidence, this court remanded the proceeding to the Secretary for consideration of the additional evidence. The Appeals Council issued an order remanding the case to the ALJ. After another *de novo* hearing, the ALJ issued a decision on May 18, 1984, finding that the severity of plaintiff's impairment equaled the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03, Mental Disorders, and precluded him from working for at least twelve (12) continuous months. On December 28, 1984, the Appeals Council issued a decision reversing the ALJ, and determining that plaintiff was not disabled prior to the expiration of his insured status on December 31, 1966. The Appeals Council's decision has become the final decision of the Secretary and therefore is properly before this court for review.

█ The jurisdiction of this court is limited to the question of whether or not the findings of the Secretary are supported by substantial evidence and whether proper legal standards were applied. *Richardson*

*v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Hall v. Secretary of HEW,* 602 F.2d 1372, 1375 (9th Cir.1979). Substantial evidence means more than a mere scintilla of evidence; it is such relevant evidence as a reasonable mind might find adequate to support a conclusion. *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427. Furthermore, this standard of review is more than a rubber stamp for the Secretary's decision, and is more than a mere search for the existence of substantial evidence supporting the Secretary's decision. The reviewing court must look to the record as a whole. *Vidal v. Harris,* 637 F.2d 710 (9th Cir.1981). It is clear that "the substantiality of evidence must take into account whatever the record fairly retracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). It is not the function of this court, however, to review the evidence *de novo;* where the evidence is susceptible to more than one rational interpretation, it is the Secretary's conclusion which must be upheld. *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir.1982).

The Appeals Council found plaintiff not disabled. To be found "disabled" an individual must be unable to engage in any substantial gainful employment by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.-1501 *et seq.* (1984). The burden of proof rests on the plaintiff to establish disability; if, however, plaintiff establishes that his impairment prevents him from engaging in work he or she has performed in the past, then the burden of proof shifts to the Secretary to show that the claimant can engage in other types of substantial gainful employment. *Allen v. Secretary of HHS,* 726 F.2d 1470, 1472 (9th Cir.1984).

## SUBSTANTIAL EVIDENCE ANALYSIS

1. *Evidence for Mental Disorders*

█ Psychiatric impairments are not as readily amenable to substantiation by ob-

jective laboratory testing as are medical impairments and consequently, the diagnostic techniques employed in the field of psychiatry may be less tangible than those in the field of medicine. *Lebus v. Harris,* 526 F.Supp. 56, 60 (N.D.Cal.1981). Mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of mental illness. *Id.* A strict reading of the statutory requirement that an impairment be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques" is inappropriate in the context of mental illnesses. *Id.;* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C). Thus, when mental illness is the basis of a disability claim, as in this case, clinical and laboratory data may consist of the diagnoses and observations of professional psychiatrists and psychologists. *Lebus,* 526 F.Supp. at 60.

 In addition to medical evidence, third party non-medical information may be useful in obtaining a better description of the individual's daily activities, interests, and interpersonal relationships. Information provided by others, including family members, who have had close contact with the individual and have knowledge of his living conditions, should be considered. Social Security Ruling 83–15 (January 1983) Unemployment Insurance Reports, 1239, Paragraph 12,429.75–.786.

### 2. *Relevant Time Period for Considering Evidence*

 In order to be entitled to disability insurance benefits, plaintiff must establish that a disability existed at or prior to the time when the earnings requirements were last met. *Vincent v. Heckler,* 739 F.2d 1393, 1394 (9th Cir.1984). In this case, plaintiff must establish that a disability existed prior to December 31, 1966. However, plaintiff is not confined, as the Secretary insisted (Court Transcript 242, hereinafter "CT"), to evidence in existence prior to that date. Medical reports containing observations made after the period for

disability are relevant in assessing the claimant's disability. *Kemp v. Weinberger,* 522 F.2d 967, 969 (9th Cir.1975). It is inevitable that medical reports will be rendered retrospectively and thus, they should not be disregarded solely on that basis. *Bilby v. Schweiker,* 762 F.2d 716, 719 (9th Cir.1985). Further, it is this court's duty to examine the record, read as a whole, to determine if the Secretary's decision is supported by substantial evidence. *Gallant v. Heckler,* 753 F.2d 1450, 1453 (9th Cir.1984).

### 3. *Medical Evidence*

In reaching his decision that plaintiff's mental impairment did not meet or equal the listed impairment requirements, the Secretary relied on two evaluations performed while plaintiff was in the Navy, in addition to a predischarge evaluation, and an examination conducted after the plaintiff's discharge in 1962. The first evaluation conducted by a Navy doctor, Dr. Cook, occurred on February 10, 1958 and lasted less than twenty minutes (CT 89, 192). Dr. Cook noted that plaintiff was not psychotic, describing plaintiff's problem as motivational (CT 192). Yet, the record indicates that Dr. Cook dismissed plaintiff as an "immature punk that just doesn't want to serve his country...." Also, Dr. Cook threatened plaintiff with confinement in the psychiatric ward for six months to a year unless plaintiff would "grow-up" and "quit rebelling against authority." (CT 89).

The second evaluation, which occurred on March 19, 1958, states that plaintiff did "not manifest a personality defect or mental illness which would warrant consideration for psychiatric discharge." (CT 209). However, this report does not indicate the severity of plaintiff's mental illness for purposes of § 12.03 of the listings. Instead, it merely states that plaintiff's condition did not necessitate a discharge from the Navy. Further, the record suggests that both of these evaluations were conducted *prior* to overt manifestation of plaintiff's illness (CT 279).

The third evaluation was a predischarge report conducted on January 10, 1960; the report has a check in the box for "normal" in the category of "psychiatric." (CT 201). There is absolutely no indication of what this report was based on. In addition, there is evidence that a fellow corpsman removed plaintiff's psychiatric records from plaintiff's file (CT 91–92) which would explain the "normal" evaluation on plaintiff's predischarge report. Finally, there was an examination conducted by Dr. Cohn on August 8, 1962, which provides no assistance whatsoever in assessing plaintiff's mental condition at that time (CT 182).

Aside from the apparent infirmities of these medical records relied upon by the Secretary, it is uncontroverted that paranoid schizophrenia does not manifest itself until the late teens or early twenties (plaintiff entered the Navy at age seventeen). (CT 185, 315). Thus, the disease is far easier diagnosed in retrospect, rather than prospectively. *Halvorsen v. Heckler*, 743 F.2d 1221, 1226 (7th Cir.1984).

In 1965, plaintiff claims he attended counseling at the Maricopa Medical Clinic, which he terminated after becoming paranoid (CT 106–07). Plaintiff claims he was told that he had "a lot of anxiety." (CT 106). Although the record is unclear, plaintiff apparently was diagnosed as suffering from depression and schizophrenia by Drs. Galloway, Bayer and Di Maio (CT 108–09). This diagnosis was confirmed in 1978 by Dr. Anderson, "Impression: Schizophrenia reaction, paranoid, chronic, with severe, chronic depression superimposed." (CT 177). Dr. Anderson did not attempt to determine the onset of plaintiff's disability.

In 1981, plaintiff was examined by Dr. Vander Veer who diagnosed plaintiff's condition as consistent with schizophrenia (CT 184). Referring to Dr. Cook's 1958 diagnosis that plaintiff was not psychotic, Dr. Vander Veer disagreed, stating that:

during his experience in the service he was very anxious, was socially isolated and probably paranoid. In addition he experienced a germ phobia and had episodes which might be described as dissociative: i.e. he felt 'far away.' This is all consistent with either the first overt manifestations of schizophrenia or a very insecure man under a great deal of stress. (CT 185).

Dr. Vander Veer felt that it was reasonable to conclude that plaintiff's disability began during his tenure in the service (CT 185). Dr. Quiroga also interviewed plaintiff in 1981, concluding that plaintiff had an "elaborate delusional system" stemming from a "misinterpretation of an actual event in his life." (CT 233–34). The event referred to was plaintiff's ninety-day confinement in the "brig" for going AWOL (CT 233). While in the brig, plaintiff was assigned to clean out the filth in the bilges; he was beaten and intimidated (CT 316–19).

Finally, there is the March 18, 1982, report of Dr. Newport, which was based on five interviews conducted over a three month period with plaintiff (CT 249). In his report, Dr. Newport noted that plaintiff's first year of military service was marked by poor peer relationships, growing anxieties, isolation and the beginning of delusional thinking and phobic behavior (CT 312). After a perceived betrayal by the Navy Chaplain and plaintiff's brig confinement, plaintiff's symptoms became overt. Plaintiff was depressed, anxious and isolative with delusions of persecution; he had poor concentration, poor impulse control, severely compromised capacity for object relations and flattened affect, all of which continued to plague plaintiff throughout his life. *Id.* Dr. Newport accordingly diagnosed plaintiff as a paranoid schizophrenic. As for the onset date, Dr. Newport concluded that plaintiff's symptoms became overt psychosis in the military (CT 314), particularly, "the period commencing at (sic) with his discharge from the service." (CT 279). Also, Dr. Newport remarked on the absence of explanation for plaintiff's chronic social dysfunction; criminality, antisocial behavior or laziness could not suffice as an explanation. *Id.*

The Secretary dismissed Dr. Newport's testimony and report as "entirely speculative and not persuasive" regarding

the severity of plaintiff's mental disability prior to December 31, 1966, for two reasons. First, the Secretary emphasized the lack of recorded documentation of plaintiff's disability "during the time it occurred" (CT 242). However, the report of a psychiatrist should not be rejected due to absence of substantial documentation, unless there are other reasons to question the diagnostic technique. *Lebus*, 526 F.Supp. at 60. No reasons were cited for questioning Dr. Newport's diagnostic technique. Thus, this was an improper ground for dismissing Dr. Newport's statements.

■ Second, the Secretary cited plaintiff's "successful college performance" as the "best evidence" of plaintiff's mental health during the period in question (CT 242). Characterization of plaintiff's educational experience as "successful" is highly inaccurate. Mere participation in an activity does not, of itself, reflect upon the degree of impairment severity. This can only be measured by considering the quality, independence, frequency, and appropriateness of the activities. Social Security Ruling 83–15, Unemployment Insurance Reports at 1239. While the mere existence of symptom-free periods may negate a finding of disability when a physical impairment is involved, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim. *Lebus*, 526 F.Supp. at 61. Turning to the facts, plaintiff took eleven years, including summer school, to complete a four-year degree program (CT 98, 105). The Secretary cited the period of Fall, 1966 through and including Fall, 1967 as the relevant period for assessing plaintiff's mental health (no explanation is provided as to why the Secretary goes beyond December 31, 1966, after continually insisting on "contemporaneous" evidence). Yet, the Secretary ignored the 1964–65 school year of plaintiff. Including that school year, it is evident from plaintiff's transcripts that he only completed 15 courses of the 30 courses he enrolled in. He withdrew from 14 courses to avoid grades of failure and he did, in fact, fail one course (CT 223–24, 242). Considering the quality and nature

of plaintiff's activities, his education hardly contradicts Dr. Newport's statements. Instead, it supports Dr. Newport's conclusion that plaintiff was trying to deny his illness and inability to function in society by attending school; also, plaintiff's numerous "starts" and "failures" are consistent with the schizophrenic illness (CT 278–79, 283).

### 4. *Non-Medical Evidence*

■ Pursuant to an order filed on July 28, 1983, this court required the Secretary to consider new evidence which included statements from plaintiff's family and friends, along with the reports of Drs. Newport and Shipley (a cousin of plaintiff) (CT 330). The court considered these statements important because of the difficulty in substantiating a psychiatric impairment by clinical and laboratory testing alone. After reviewing this evidence, the ALJ found that plaintiff was disabled (CT 250–52). However, the Secretary did not give the statements of family members (including Dr. Shipley) or friends "any weight" because of remoteness in time and because they were too vague and generalized (CT 242).

■ Such a categorical rejection of relevant evidence cannot be accepted. For example, Robert Halpin, a friend of plaintiff's, provided detailed information about his and plaintiff's experience in the brig, and plaintiff's particular inability to cope with the situation (CT 316–19). Halpin related noticeable changes in plaintiff's personality from his time in High School to that of the brig confinement and after his discharge from the Navy. Plaintiff's sister noted specific changes in his conduct after his discharge, such as an obsession with cleanliness, increased sleeping habits and an emotionally "cold" disposition (CT 324). These statements support both plaintiff's testimony and the medical opinions, indicating that plaintiff was disabled after his discharge from the Navy.

### 5. *Other Factual History*

■ In addition to the medical opinions and statements from friends and family,

plaintiff's history leads to the inescapable conclusion that his disability began during or shortly after his Naval service. During his tenure in the Navy, plaintiff suffered two traumatic events: perceived betrayal by the Navy chaplain after plaintiff returned from going AWOL, and his confinement in the brig (CT 85–87). Following his discharge in 1960, plaintiff hid in a chicken coop for two weeks out of fear that the Navy would "get" him (CT 95). Plaintiff lived at home with his mother or was supported by her from 1960 until 1977, unable to support himself or exist in the outside world (CT 108, 228). Plaintiff's marriage lasted only a few days (CT 100). After his discharge, plaintiff would sleep 15–18 hours a day if no one bothered him (CT 97). Plaintiff took eleven years to complete his college degree (CT 98, 105).

Plaintiff's work experience subsequent to his discharge consisted of brief attempts as a sales clerk, stock clerk, delivery person, manager of a housewares department in a discount store, a McDonald's employee and a package wrapper (CT 101–02). From 1960 to 1965, his total earnings per year never exceeded $465; in 1964 he earned $62.81, in 1965 he earned $445 and in 1966, he earned $94.37. He has been unable to work since 1968 due to stress and trauma (CT 102). The Secretary concedes that these brief experiences did not constitute substantial gainful activity (CT 243).

In 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00, an introductory note sets forth the relevant criteria for evaluating mental disorders: 1) daily activities both in the occupational and social spheres; 2) range of interest; 3) ability to take care of personal needs; and 4) ability to relate to others. Based on these criteria, it is apparent from plaintiff's factual history, the statements from his friends and family and the medical reports of Drs. Vander Veer, Quiroga and Newport that there is substantial evidence of disability and very little to the contrary. The record must be examined as a whole; the court considers both evidence that supports, and evidence that detracts from, the Secretary's decision. *Gallant,* 753 F.2d at 1455. Applying these standards to the entire record, it is apparent that the Secretary's decision that plaintiff was not disabled prior to December 31, 1966, is unsupported by substantial evidence and, conversely, substantial evidence supports a finding that plaintiff was disabled.

### 6. *Remedy*

If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. *Lewin v. Schweiker,* 654 F.2d 631, 635 (9th Cir.1981). Here, the record has been thoroughly developed and in fact, the case has been remanded once already to consider new evidence. There is no indication that any other evidence need be considered. Where a rehearing would simply delay receipt to benefits, reversal is appropriate. *Id.* Having considered the entire record, it is clear that plaintiff was disabled prior to December 31, 1966. Remanding this case would merely cause a delay in plaintiff's receipt of benefits. Therefore, the plaintiff's motion for summary judgment is GRANTED.

### SEQUENTIAL ANALYSIS & DUE PROCESS CLAIMS

Plaintiff claims the Secretary failed to properly evaluate his ability to perform substantial gainful activity. In addition, plaintiff asserts a denial of due process occurs when a favorable ALJ decision is reversed by the Appeals Council without a prior hearing. Having disposed of this case on the ground that the Secretary's decision was unsupported by substantial evidence, it is unnecessary to reach these two issues.